Andrea Santarsiere (ISB #8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
(303) 854-7748
asantarsiere@biologicaldiversity.org

Lauren M. Rule (ISB #6863)
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

**Northern Division**

CENTER FOR BIOLOGICAL DIVERSITY, THE LANDS COUNCIL, and DEFENDERS OF WILDLIFE,

*Plaintiffs,*

v.

DAVID BERNHARDT, in his official capacity as Secretary of the Interior; and UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendants.*

Case No.:_______________

**COMPLAINT**

## INTRODUCTION

1. Woodland caribou, often referred to as North America's reindeer, are one of the most endangered animals on the continent. These animals historically inhabited temperate rain forests of Canada and the northern United States, but their numbers and range have shrunk substantially in both countries.

2. In the lower 48 states, woodland caribou once occurred in New England, the upper Midwest and the northern Rocky Mountains. By the time they were protected under the Endangered Species Act in 1982, woodland caribou in the United States had declined to just one small population that used habitat in Idaho, Washington and southern British Columbia, known as the southern Selkirk Mountains population of woodland caribou.

3. Despite this protection, these caribou continued to decline in the face of logging, forest fires, increased snowmobiling, predation, and other threats. In January 2019, Canadian officials took the last animals from the southern Selkirk population of woodland caribou into captivity, meaning caribou are no longer present in the lower 48 states.

4. The caribou's long decline demonstrated the considerable need for greater protection and sustainable recovery efforts, yet the U.S. Fish and Wildlife Service ("Service") for decades failed to take necessary action to recover the caribou or to provide additional protections required by the Endangered Species Act ("ESA"), such as the designation of critical habitat.

5. Spurred by a petition and litigation from Plaintiffs, the Service finally proposed designation of 375,562 acres of critical habitat in Boundary and Bonner Counties in Idaho and Pend Oreille County in Washington on November 30, 2011, but in the end, only finalized designation of 30,101 acres in 2012.

6. Plaintiffs challenged this drastic reduction of critical habitat designation and on March 23, 2015, the U.S. District Court of Idaho remanded the Service's final critical habitat rule. The Service, however, has yet to finalize a new designation.

7. At the same time and despite the caribou's precarious status, the Service

considered downlisting the Selkirk Mountain population of woodland caribou from endangered to threatened. In response to a petition to delist the caribou by Bonner County and the Idaho State Snowmobile Association, the Service determined that the southern Selkirk Mountain population of woodland caribou was actually part of the larger Southern Mountain Caribou "Distinct Population Segment" ("DPS"), which also includes caribou herds in Canada. The Service proposed designating the entire Southern Mountain Caribou DPS as threatened on May 8, 2014. The Service has failed to finalize this proposal, leaving the caribou's status in limbo at a time when it needs active management and habitat protection to bring it back to the lower 48 states.

8. Plaintiffs Center for Biological Diversity, The Lands Council, and Defenders of Wildlife hereby challenge the Service's failure to timely issue a final rule listing the Southern Mountain Caribou DPS as threatened or endangered, and failure to timely issue a final critical habitat designation in violation of the ESA and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

9. This Court has jurisdiction and authority to issue the requested relief pursuant to 16 U.S.C. §§ 1540(c) and (g)(1)(C) (action arising under the ESA's citizen suit provision); 5 U.S.C. §§ 701-706 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment Act).

10. Venue is proper under this Court pursuant to 28 U.S.C. § 1391(e), 16 U.S.C. § 1540(g)(3)(A), and District Local Rule 3.1 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

11. As required by the ESA, 16 U.S.C. § 1540(g)(2)(A), Plaintiffs provided Defendants with notice of their intent to sue over the violations of law alleged in this Complaint more than 60 days ago. Because Defendants have not remedied these violations of law, an actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

12. The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g)(1).

**PARTIES**

13. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center is based in Tucson, Arizona, with offices throughout the country, including in Idaho. The Center has more than 69,000 members, including more than 3,750 in Idaho and Washington. The Center and its members have a long-standing interest in conserving native species in the American West and routinely advocate for native species conservation and protection. The Center has been advocating for the conservation and protection of woodland caribou for more than 15 years.

14. Plaintiff THE LANDS COUNCIL ("TLC") is a Washington nonprofit organization dedicated to protecting and conserving the natural resources and quality of life in the Inland Pacific Northwest. TLC's principle office is located in Spokane, Washington. TLC, as an organization on behalf of its staff and members, has been extensively involved in seeking to promote sound land management practices, including protection and recovery of woodland caribou.

15. Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a national nonprofit conservation organization with headquarters in Washington, D.C. Defenders has more than 350,000 members nationwide, including more than 12,000 in Washington and Idaho. Defenders' mission is to protect all native wild animals and plants in their natural communities. Defenders has developed programs for combating species extinction, the loss of biological diversity, and habitat alteration and destruction. Defenders has long been involved in seeking to promote the protection and recovery of the woodland caribou in the United States as well as in Canada, and has participated in agency proceedings relevant to the woodland caribou.

16. Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation, protection, and recovery of

woodland caribou. Plaintiffs have participated in many agency proceedings to protect and recover woodland caribou of the Southern Mountain Caribou DPS. Plaintiffs also have an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including the ESA. Plaintiffs' interests in protecting and recovering woodland caribou are directly harmed by the Service's failure to timely define the Southern Mountain Caribou DPS and list it as a threatened or endangered species, and to make a final determination designating critical habitat.

17. Plaintiffs' staff, members, and supporters live near and regularly visit areas recently occupied by woodland caribou, including but not limited to areas previously proposed for critical habitat by the Service. Plaintiffs' staff, members, and supporters often use these areas for recreation, including to observe and photograph native wildlife, including woodland caribou and other species, in their natural habitat. Plaintiffs' staff, members, and supporters have professional, spiritual, aesthetic, and recreational interests in woodland caribou and woodland caribou habitat. Plaintiffs' staff, members, and supporters have visited and plan to continue to travel to and recreate in areas recently occupied by woodland caribou, and they will maintain an interest in woodland caribou and woodland caribou habitat in the future. Plaintiffs' staff, members, and supporters' professional, spiritual, aesthetic, and recreational interests and enjoyment have been and will continue to be greatly diminished by the absence of woodland caribou in these areas.

18. Defendants' failure to comply with the nondiscretionary deadline for finalizing the designation of and the requisite listing determination for the Southern Mountain Caribou DPS, and Defendants' failure to make a timely critical habitat designation, have harmed and will continue to harm Plaintiffs' interests. The injuries described above are actual, concrete injuries presently suffered by Plaintiffs' staff, members, and supporters, and they will continue to occur unless this Court grants relief. These injuries are directly caused by Defendants' inaction, and the relief sought herein—an order compelling a listing and critical habitat determination for woodland caribou—would redress those injuries. Plaintiffs have no other adequate remedy at law.

19. Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior ("Interior Department") and the federal official in whom the ESA vests final responsibility for listing and critical habitat decisions. David Bernhardt is sued in his official capacity.

20. Defendant UNITED STATES FISH AND WILDILFE SERVICE is the agency within the Department of the Interior that is charged with implementing the ESA for most terrestrial species, including the woodland caribou, and is responsible for promptly complying with the ESA's mandatory deadlines.

## LEGAL BACKGROUND

### I. The Endangered Species Act

21. The ESA declares that endangered and threatened species are of "esthetic, ecological, education, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b). To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

22. To this end, section 4 of the ESA requires that the Secretary of the Interior Department conserve imperiled species by listing them as either "endangered" or "threatened." *Id.* § 1533(a)(1). The Secretary has delegated its administration of the ESA to the Service. 50 C.F.R. § 402.10(b).

23. A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

**A. Listing and Delisting Petitioning Process**

24. An interested person may petition the Service to add or remove from the list a particular species. *Id.* § 1533(b)(3)(A). Within 90 days of receiving a petition, the Service must "to the maximum extent practicable," make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* This is known as the 90-day finding.

25. If the Service determines that a petition presents substantial information indicating that listing or delisting may be warranted, the agency must conduct a thorough scientific review of the species' status. *Id.* Upon completion of this "status review," and within 12 months from the date that the Service receives the petition, the Service must make one of three findings: (l) the petitioned action is "not warranted;" (2) the petitioned action is "warranted;" or (3) the petitioned action is "warranted but precluded" by other pending proposals. *Id.* § 1533(b)(3)(B). This is known as the 12-month finding.

26. If the Service's 12-month finding concludes that the petitioned action is warranted, the agency must publish notice of a proposed regulation in the Federal Register for public comment. *Id.* § 1533(b)(3)(B)(ii). Within one year of publication of the proposed regulation, the ESA requires the Service to render its final determination on the proposal. *Id.* § 1533(b)(6)(A). At such time, the Service must either adopt the petitioned action; withdraw the proposed rule; or, if there is substantial disagreement about scientific data, delay a final determination for up to six months to gather more scientific information. *Id.* §§ 1533(b)(6)(A)(i), and (B)(i). This is known as the final determination or final rule.

**B. Critical Habitat**

27. Concurrent with listing a species, the ESA requires the designation of critical habitat. "The Secretary . . . shall, concurrently with making a determination . . . that a species is endangered or a threatened species, designate any habitat of such species which is then considered to be critical habitat. *Id.* § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C).

28. If the Secretary finds that critical habitat is "not determinable" at the time of

listing, then it "may extend the one-year period . . . by not more than one additional year . . . ." *Id.* § 1533(b)(6)(C)(ii). "[B]ut not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extend prudent, such habitat." *Id.*

29. Critical habitat includes specific areas occupied by the species with "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection" as well as specific areas unoccupied by the species that "are essential for the conservation of the species." *Id.* § 1532(5)(A).

30. Congress recognized the importance of habitat protections to the conservation of endangered species. The legislative history of the Act shows Congress recognized the importance of timely critical habitat designation in conserving listed species:

> [C]lassifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence. . . . If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then *the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.*

H.R. Rep. No. 94-887 at 3 (1976) (emphasis added).

31. The ESA does not safeguard a species' critical habitat until the Service designates it. Accordingly, it is essential that the Service dutifully follow the ESA's procedures and deadlines to ensure it designates critical habitat in a timely manner.

**C. DPS Definition**

32. The term "species" is defined under the ESA to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). Distinct population segment is not defined under the ESA.

33. On February 7, 1996, the Service and the National Marine Fisheries Service published a joint "Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act" to explain when recognizing a DPS is appropriate. 61 Fed.

Reg. 4772 (Feb. 7, 1996). This is known as the 1996 DPS policy.

34. According to the 1996 DPS policy, for a population segment to qualify as a DPS, the population segment must be discrete and significant. *Id.* at 4725.

35. A population segment may be considered significant if it satisfies either of the following conditions: (1) persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; (2) evidence that the discrete population segment differs markedly from other population segments in its genetic characteristics; (3) evidence that the population segment represents the only surviving natural occurrence of the taxon that may be more abundant elsewhere as an introduced population outside its historical range; or (4) evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon. *Id.* This list is not meant to be exclusive. *Id.*

36. If the population segment qualifies as a DPS, the Service must evaluate the conservation status of the DPS to determine whether it is endangered or threatened. *Id.*

**II. The Administrative Procedure Act**

37. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof." 5 U.S.C. § 702.

38. It further provides that the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

**I. Woodland Caribou**

39. Woodland caribou historically occupied much of Canada and the northern tier of the United States, including areas in New England, the Great Lakes states, and the Pacific Northwest. Woodland caribou no longer occupy any areas in the lower 48 states. They have also declined significantly in many parts of Canada.

40. Caribou are the only member of the deer family in which both sexes grow antlers. The southern Selkirk Mountains population of woodland caribou falls into the mountain ecotype.

Behavioral and ecological characteristics distinguish mountain caribou from other woodland caribou ecotypes.

41. Mountain caribou require large contiguous areas of high-elevation old growth forest with little or no disturbance to survive, where they rely heavily on arboreal lichens as their primary winter food. With hooves as large as dinner plates, they are specially adapted to walk upon deep snowpack. They also have a range of adaptations allowing them to persist in cold winter climates, including thick winter coats and an ability to lower metabolism in winter months by reducing energy expenditure. These adaptations allow mountain caribou to migrate to high elevation areas in winter, where they face little competition for food and few predators due to most species' use of lower elevation habitat in winter. However, increased human activity in mountain caribou winter habitat has diminished their food source and increased disturbance, causing caribou to expend additional energy during this difficult time of year.

42. Mountain caribou currently inhabit mountainous terrain in eastern British Columbia and until recently, inhabited the Selkirk Mountains of northern Idaho and northeast Washington. The Southern Mountain Caribou DPS consists of numerous herds. Most of the Southern Mountain Caribou herds have declined in size and range and consist of less than 50 individuals. Several of these herds still show declining trends. Southern Mountain Caribou are listed as threatened under Canada's Species at Risk Act and has been proposed for endangered status by the Committee on the Status of Endangered Wildlife in Canada.

43. The southern Selkirk Mountains population of woodland caribou is the southernmost extant, local population of woodland caribou in North America. The population historically ranged as far south as the Salmon River in Idaho and east to Montana, and scientists estimate this population may have included hundreds of individuals in the late 1800s. Since then, several factors caused significant range contraction, including habitat loss and fragmentation from logging and fire, poaching, predation, and disturbance from snowmobiles and other winter recreation.

44. After receiving petitions in 1980 to list the southern Selkirk Mountains population of woodland caribou under the Endangered Species Act, the Service recognized the highly

imperiled status of the population and used the Act's emergency procedures twice to list this population in northeastern Washington, northern Idaho, and southeastern British Columbia as endangered. At that time scientists estimated that only 13 to 20 caribou remained in the population. On February 29, 1984, the Service issued a final rule listing the species as endangered (49 Fed. Reg. 7390). The Service declared it would not issue critical habitat concurrent with listing due to fears of increased poaching.

45. After the Service listed the southern Selkirk Mountains population of woodland caribou as endangered under the ESA, the Service completed a recovery plan in 1985, which it revised in 1994. The 1985 Recovery Plan set an intermediate population target of 100 to 109 caribou, and the 1994 Recovery Plan set a goal of maintaining two herds in British Columbia and Idaho and establishing a third herd in Washington. The Service found it necessary to manage at least 443,000 acres of habitat in the Selkirk Mountains to support a self-sustaining caribou population.

46. The population ranged from 33 to 51 animals between 1991 and 2009, consisting of approximately 45 caribou as recently as 2009. However, the population declined rapidly thereafter, with monitoring efforts detecting just 12 caribou in 2017. By spring of 2018, the southern Selkirk Mountains population of woodland caribou consisted of only three caribou. This winter, Canadian officials penned the few remaining caribou in the Selkirk Mountains population, taking the last caribou into captivity on January 14, 2019.

**II. Critical Habitat**

47. After the 1984 listing of the southern Selkirk Mountains population of woodland caribou as endangered, the Service never designated critical habitat. Therefore, on December 6, 2002, more than 18 years after the Service listed the southern Selkirk Mountains population of woodland caribou, Plaintiffs and others petitioned the Service to designate critical habitat for this population. On February 10, 2003, the Service acknowledged receipt of the petition but stated that it was unable to address the petition due to budgetary constraints. After another six years went by with no substantive action by the Service, the petitioners filed a complaint for

declaratory and injunctive relief in federal district court. The parties signed a stipulated settlement agreement in which the Service agreed to make a determination as to whether to designate critical habitat no later than November 20, 2011.

48. On November 30, 2011, the Service published a proposed rule to designate approximately 375,562 acres as critical habitat in Boundary and Bonner Counties in Idaho and Pend Oreille County in Washington (76 Fed. Reg. 74,018). This proposal included occupied habitat as well as unoccupied habitat that the Service determined was necessary for recovery of the population. The Service accepted public comment and peer review on the proposed designation.

49. On November 28, 2012, the Service issued a final rule, designating only 30,101 acres of critical habitat in Boundary County, Idaho and Pend Oreille County, Washington (77 Fed. Reg. 71,042). This final designation represented a reduction of more than 93 percent from the land originally proposed for critical habitat designation by the Service.

50. On September 30, 2013, Plaintiffs and others filed a complaint in Idaho federal district court challenging the critical habitat designation, and specifically questioning the validity of the Service's significant departure from its original proposed designation. On March 23, 2015, the U.S. District Court of Idaho remanded the Service's final critical habitat rule, finding that the Service violated law by failing to provide public notice and opportunity to comment on the significant change between the proposed critical habitat designation and the final designation.

**III. Petition to Delist and the Service's Proposed Recognition of the Southern Mountain Caribou DPS**

51. On May 9, 2012, on behalf of Bonner County, Idaho and the Idaho State Snowmobile Association, the Pacific Legal Foundation petitioned the Service to delist the southern Selkirk Mountains population of woodland caribou from the list of endangered species.

52. In response, on December 19, 2012, the Service published a 90-day finding stating that the petition presented substantial information that the current southern Selkirk Mountains population of woodland caribou may not be a listable entity under the 1996 DPS Policy (77 Fed. Reg. 75,091).

53. On May 8, 2014, the Service published a proposed rule on the petition (79 Fed. Reg. 26,504). The Service found that delisting the species is not warranted and simultaneously proposed to amend the current listing of the southern Selkirk Mountains population of woodland caribou by recognizing and defining the Southern Mountain Caribou DPS. The Southern Mountain Caribou DPS includes several local woodland caribou herds that occur in southern British Columbia, including the southern Selkirk Mountains population of woodland caribou in southern British Columbia, northern Idaho, and northeastern Washington.

54. The Service found that the Southern Mountain Caribou DPS meets the criteria for a DPS under the 1996 DPS Policy. The Service found that the DPS is discrete because it is markedly separated from all other populations of woodland caribou; it is geographically, behaviorally, and reproductively isolated from other woodland caribou. The Service also found that the DPS is significant because it persists in a unique ecological setting for woodland caribou and loss of the Southern Mountain Caribou would result in a significant gap in the range of the woodland caribou species. Thus, the Service concluded that the Southern Mountain Caribou DPS is a listable entity under the ESA.

55. The Service also found that the Southern Mountain Caribou DPS is facing significant threats including: 1) destruction and curtailment of habitat due to logging, forest fires, insect outbreaks, human development, recreation and climate change; 2) predation from wolves and cougars; 3) lack of adequate regulatory mechanisms in the United States and Canada that effectively address the identified threats to the DPS; and 4) risk from stochastic events such as avalanches. The Service thus proposed to list the Southern Mountain Caribou DPS as threatened under the ESA.

56. In this proposed rule, the Service also affirmed its previously finalized critical habitat designation of 30,010 acres, noting it shall apply to the Southern Mountain Caribou DPS.

57. Following issuance of this proposed rule, the Service held two public hearings and accepted public comments for 90 days.

58. After the public comment period had closed, the Committee on the Status of Endangered Wildlife in Canada finalized its biological assessment of the Southern Mountain

caribou population, changing its designation from threatened to endangered. The assessment contained pertinent updates on population size, population trends, current threats to the population, and population viability analyses. Because the Service believed that these updates would add to the best scientific and commercial data available, upon which any final rule must be based, the Service reopened the comment period for the proposed rule on March 25, 2015 (80 Fed. Reg. 15,545).

**IV. The Final Proposed Rule**

59. In order to comply with the court's order remanding the 2012 critical habitat designation for further notice and comment, the Service opened a comment period on the 2012 critical habitat designation on April 19, 2016 (81 Fed. Reg. 22,961). The Service declared this comment period as a reopening of the comment period on the May 8, 2014 proposed rule, within which the Service proposed to define as a DPS and list as threatened the Southern Mountain Caribou DPS and simultaneously reaffirmed the agency's 2012 critical habitat designation.

60. Since reopening the comment period on these proposals in 2016, the Service has failed to finalize listing the Southern Mountain Caribou DPS and failed to finalize any critical habitat designation.

61. On February 13, 2019, Plaintiffs sent Defendants a 60-day notice of intent to sue for the agency's failure to issue a final rule. On April 16, 2019, the Service responded to the notice stating its intent to finalize the listing and critical habitat rules but failed to commit to a deadline for doing so.

## CAUSE OF ACTION
## Violation of the ESA and APA

**(Failure to Make a Final Determination on the Proposed Rules to Define and List as Threatened the Southern Mountain Caribou DPS and to Designate Critical Habitat)**

62. Plaintiffs hereby incorporate all preceding paragraphs.

63. The ESA requires the Service to issue its final determination within one year of its publication of the proposed listing. 16 U.S.C. § 1533(b)(6)(A).

64. The Service first proposed defining the Southern Mountain Caribou DPS and

listing it as threatened under the ESA on May 8, 2014.  The Service reopened the proposed rule for comments on March 25, 2015 and on April 19, 2016.  It has been over three years since the last publication of this proposed rule.

65. The Service's failure to make a final determination listing the Southern Mountain Caribou DPS violates the ESA's deadline provisions and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" under the APA.  *Id.* § 1533(b)(6)(A); 5 U.S.C. § 706(1).

66. The ESA requires the Service to designate critical habitat for a listed species concurrent with the listing of the species, or at least within a one-year period if critical habitat is not determinable at the time of listing.  16 U.S.C. §§ 1533(a)(3)(A)(i); 1533 (b)(6)(C)(ii).

67. The southern Selkirk Mountains population of woodland caribou was listed as endangered under the ESA in 1984.

68. Prompted by litigation, the Service finally issued a proposed critical habitat rule on November 30, 2011, and a final rule designating critical habitat on November 28, 2012.  On March 23, 2015, the U.S. District Court of Idaho vacated and remanded the final critical habitat designation.

69. To comply with the court's order, on August 19, 2016, the Service reissued a proposed critical habitat designation and opened a public comment period.  It has been over three years since the last publication of this proposed rule.

70. The Service's failure to make a final determination on designating critical habitat violates the ESA's deadline provisions and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" under the APA.  *Id.* §§ 1533(a)(3)(A)(i); 1533 (b)(6)(C)(ii); 5 U.S.C. § 706(1).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court:

A. Declare the Service violated the ESA and APA by failing to timely make a final

determination on the listing of and designation of critical habitat for the Southern Mountain Caribou DPS;

B. Order the Service to make a final determination on the definition and listing of the Southern Mountain Caribou DPS in compliance with the requirements of the ESA and APA;

C. Order the Service to make a final determination on the designation of critical habitat for the Southern Mountain Caribou DPS in compliance with the requirements of the ESA and APA;

D. Award Plaintiffs their reasonable attorneys' fees, costs, and litigation expenses under the ESA, 16 U.S.C. § 1540(g), the Equal Access to Justice Act, and/or any other applicable provision of law; and

E. Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs, the public, and the affected species.

Dated: July 10, 2019

Respectfully submitted,

/s/ Andrea Santarsiere
Andrea Santarsiere (ISB #8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
(303) 854-7748
asantarsiere@biologicaldiversity.org

Lauren M. Rule (ISB # 6863)
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

*Attorneys for Plaintiffs*